BARNES, (PHILADELPHIA & R. R. CO. v.) See Case No. 11,087.

## Case No. 1,019.

### BARNES v. RETTEW.

[28 Leg. Int. 124;[1] 8 Phila. 133.]

Circuit Court, E. D. Pennsylvania. April 14, 1871.

ACT OF BANKRUPTCY — ASSIGNMENT FOR BENEFIT OF CREDITORS — FRAUD — CONSTRUCTIVE AND ACTUAL.

1. A debtor's assignment of all his estate, in trust for distribution among all his creditors equally, tends necessarily "to defeat or delay the operation" of the bankrupt law [of March 2, 1867; 14 Stat. p. 517. c. 176,] and, therefore, if executed after this law (on 1st June, 1867,) went into practical operation, and within the prescribed limit of six months before the commencement of proceedings against him under the 39th section, is an act of bankruptcy.

[See Ex parte Burt, Case No. 2,210; Ex parte Breneman, Id. 1,830; In re Croft, Id. 3,404; Globe Ins. Co. v. Cleveland Ins. Co., Id. 5,486; In re Frisbee, Id. 5,129; Jones v. Sleeper. Id. 7,496; Hutchins v. Taylor, Id. 6,953; In re Mendelsohn, Id. 9,420.]

[Contra, Ex parte Kintzing; Id. 7,833; Smith v. Teutonia Ins. Co., Id. 13,115.]

2. The assignment, though constructively fraudulent with such relation to the bankrupt law, is, in the absence of actual fraud, not void, but voidable, and not voidable otherwise than at the suit of the assignee in bankruptcy.

In equity under the auxiliary jurisdiction conferred by the bankrupt law. The bill, at the suit of the assignee in bankruptcy, of partners who had, within six months before the commencement of the proceedings, made a voluntary assignment to the defendant of all their estate in trust for the equal benefit of all their creditors, prayed an injunction, &c., and a final decree setting aside the assignment. On a motion for an injunction, &c., before answer, the case was heard interlocutorily, upon affidavits, before the district judge holding the circuit court. It was contended, first, that the assignment, being in itself an act of bankruptcy, was, on its face, notice to the party receiving it of its tendency to defeat or delay the operation of the bankrupt law; secondly, that the assignment was tainted with actual fraud, having been executed without consulting creditors, though there had been a previous meeting of them,— and the voluntary assignee having precipitately advertised the whole available effects for sale at auction, without notice to creditors who were proceeding adversarily in bankruptcy.

On the other side, it was urged that the sale advertised would have been a fair and advantageous one, that it had been suspended so soon as any objection to it was known, and that a great number of the creditors had, in writing, approved of the voluntary assignment since its execution. The judge said that the minority of the creditors, or a single dissenting creditor, had rights of which

---

[1] [Reprinted by permission.]

the others could not thus deprive him, but that if the true interests of the general body of the creditors would be promoted by refusing the injunction, it ought not, in this stage of the case, to be granted; that the present question could not be determined advisedly without an authoritative decision of the question, whether such an assignment was an act of bankruptcy, a point upon which some doubt had arisen from a reported note of two cases in the circuit court for the southern district of Ohio, 2 N. B. R. [Quarto,] 180, 181, [Langley v. Perry, Case No. 8,067; Farrin v. Crawford, Id. 4,686,] and that an argument on this point, ought, if possible, to be postponed until the arrival of the circuit judge, which would probably occur in a few days.

The case therefore stood over, the defendant agreeing to do nothing without the knowledge and supervision of the complainant, who was to have unrestricted access to books, papers, &c. The question, whether the assignment had, in itself alone, been an act of bankruptcy, independently of any question of actual fraud, was afterwards argued before the circuit judge and the district judge, holding together the circuit court.

Mr. Miller, for the defendant, relied on the cases of Sedgwick v. Place, [Case No. 12,-622;] Langley v. Perry, [Id. 8,067;] and Farrin v. Crawford, [Id. 4,686;] the last two of which had been mentioned, as above, on the former hearing of the motion. Mr. Miller urged considerations of the hardship and inconvenience likely to result from holding such an assignment, when fairly and honestly made, an act of bankruptcy.

R. C. McMurtrie and James W. Paul, for complainant.

E. Spencer Miller and W. W. Juvenal, for respondent.

Before McKENNAN, Circuit Judge, and CADWALADER, District Judge.

McKENNAN, Circuit Judge. The question is not new to me on the general grounds upon which it has been argued. There may also be special considerations applicable to it in Pennsylvania. Does not the legislation of the state, as to such assignments, tend necessarily to delay the creditors of a bankrupt, and to defeat or delay the operation of the act of congress? And must not the debtor who makes the assignment be legally understood as intending what is thus a necessary tendency of his act? We are desirous to hear whatever can be suggested for the defendant as to the effect of the laws of the state upon the question.

Nothing further was said by the defendant's counsel.

THE COURT said that they did not, at present, desire to hear the counsel for the complainant. The question was held under advisement for some days.

CADWALADER, District Judge. The following opinion is that of Judge McKENNAN and myself:

In England, the statute of 1604 (1 Jac. I. c. 15, § 2) made it an act of bankruptcy for a debtor to execute any fraudulent conveyance or transfer, to the intent, or whereby his creditors should or might be defeated or delayed; the meaning of which was, to the intent that they should, or whereby they might be defeated or delayed: 8 East, 487. This enactment was repealed and supplied by the statute of 1825, (6 Geo. IV. c. 16, § 3,) which simply made it an act of bankruptcy to execute any fraudulent conveyance or transfer with intent to defeat or delay his creditors. It was decided that notwithstanding the substitution of the conciser expression with intent, for the former words to the intent or whereby, the statutes were, in effect, the same, because, if the necessary consequence of a man's act is to delay his creditors, he must be taken to intend it: 1 Cromp. M. & R. 779, 780. The statute of 1849, (12 & 13 Vict. c. 106, § 67,) in force in England at the time of the enactment of the present bankrupt law of the United States, was, in this respect, the same as the statute of 1825. Upon these few words of English legislation, all questions, whether a conveyance or transfer was an act of bankruptcy, have depended. In St. 13 Eliz. c. 5, the same words had been only declaratory of the general law as between debtor and creditor. They had a more extended application in the bankrupt law, to effectuate its purposes, and prevent its intended operation from being frustrated, or impeded.

Conveyances or transfers constructively, though not actually fraudulent, were in general of two kinds; those which, independently of any legislative system of bankruptcy would, from their tendency to delay creditors, have been fraudulent under St. 13 Eliz. c. 5, the leading exposition of which is in Twyne's Case, 3 Coke, 80b, [1 Smith, Lead. Cas. 33,] and those which, in the absence of the legislative system of bankruptcy, would have been unobjectionable, but were fraudulent as against its manifest policy of equal and speedy distribution under the prescribed course of peculiar summary procedure. A sub-division of those of the latter kind was into, first preferences of favored creditors, and secondly, such dispositions of property as, though neither preferences, nor in themselves fraudulent under St. 13 Eliz. alone, put the property, nevertheless, "into a different course of distribution from what the bankrupt laws directed." There was no express enactment as to preferences, except the requirement of equal distribution. But the policy of equal distribution was founded in part upon a theory that equality is equity, and, in great part also, upon a motive to prevent the overtrading which would be inevitable where a failing debtor could at pleasure prefer a favoring or a favored creditor. Such a pref-

erence was therefore a fraud upon a bankrupt law. So the legislation was silent as to dispositions by a failing trader of property which put it out of the prescribed course of distribution in bankruptcy. But they were fraudulent as intended to delay or impede such distribution, because this was their inevitable tendency.

There were thus conveyances constructively fraudulent, which might have been classed under three heads: 1, conveyances fraudulent under St. 13 Eliz. alone; 2, fraudulent preferences; 3, conveyances in derogation of the prescribed jurisdiction. If this classification is, for certain purposes, adopted, it must not be forgotten that the first head is a general one, and the second and third are sub-divisions of another general head.

A failing debtor's disposition of his whole available estate for the benefit of one or more, but not all of his creditors, must be a preference, or partake of the nature of one, if the word is used in its popular sense. But such a conveyance or transfer may not be a fraudulent preference, that is to say, may not under the second of the three heads, be objectionable in bankruptcy as a preference, and yet may be an act of bankruptcy. It is one, if it either stops his business, or, without stopping it, puts his available means beyond his own legal control. Ex parte Bailey, (Ct. App.) 3 De Gex, M. & G. 534; Smith v. Cannan, (Exch. Chamber,) 2 El. & Bl. 35. His other creditors are necessarily delayed in either case; and whether the act should be classed under the first or under the third head, or under each of them, may depend upon circumstances.

As to a voluntary assignment of his whole estate for the equal benefit of all his creditors, the question was different. Such a disposition of the estate was not in any case a preference; and, except in reference to the bankrupt laws, did not objectionably delay creditors. 3 Maule & S. 371. The disposition, if an act of bankruptcy, was therefore to be classed under the third head. That it constituted an act of bankruptcy was, in Lord Eldon's opinion, settled beyond a doubt by decisions of which he recognized the reason to be that such an act placed a failing debtor's property under a distribution different from that ordained by the bankrupt laws. But Lord Eldon said that the direct and immediate object of such a deed was not to delay but to satisfy creditors. He thought that these decisions had therefore carried the reason to an extravagant length, although he acquiesced in their authority. (A. D. 1809,) 16 Ves. 148; (A. D. 1809–10) 17 Ves. 197. As to the soundness of his criticism of them, subsequent opinions have differed. If the voluntary assignment would, in effect, have promoted a speedy disposal and collection, and a prompt distribution, through the officer of a commercial tribunal who was always under its immediate supervision and summary control, it might have been a sound

criticism. But the voluntary assignee was chosen by the debtor; and was, except under the general contentious equitable jurisdiction of trusts, an independent private functionary. The assignee in bankruptcy, on the contrary, was chosen by the creditors, and was an officer of the court of bankruptcy, (1 Atk. 91,) whose jurisdiction of all matters between him and the creditors was summary (Id. 88) and simple, with a peculiar consolidation of business otherwise judicially regarded as multifarious. In the contentious administration of the trusts of the voluntary assignment under a bill in equity, all parties interested might indeed, sooner or later, be represented or protected. But this expensive and formal, and comparatively complex proceeding would have been dilatory until the decree to account, and, in some respects, afterwards; and would, in every stage, be incongruous to the prescribed jurisdiction of the commercial tribunal. The judges whose decisions were criticized by Lord Eldon, had, therefore, with relation to this prescribed jurisdiction, considered such a voluntary assignment an act whose tendency was necessarily to delay creditors.

It was decided by Lord Mansfield, at nisi prius, in 1767, that an assignment by a debtor of all his effects, to two of his creditors, in trust for themselves, and all his other creditors, in consequence of a proposition made by him at a meeting of his creditors, and accepted by them. was an act of bankruptcy, as a fraud on the bankrupt laws, unless every creditor had concurred. Kettle v. Hammond, Cooke, Bankr. Law, 111, (100.) Seven years later, Lord Mansfield said, extra-judicially, that a debtor could not assign his effects even to be equally divided amongst all his creditors, because he could "not take his estate out of that management which the law puts it into." Cowp. 123. In 1799, and again in 1803, such an assignment was decided by the court of king's bench to be an act of bankruptcy: 8 Durn. & E. [8 Term R.] 140; 4 East, 230. All bankruptcies were then, in form, involuntary. But they were seldom such in fact. A concerted act of bankruptcy was indeed condemned. But a friendly proceeding in bankruptcy was not. The most experienced commissioner of the period wrote that ninety-nine out of one hundred bankruptcies were willing or friendly: 1 Christ. Bankr. Law, (2d Ed.) 188. It was then a frequent practice for a debtor to make such an assignment with an expectation of being, in consequence of it, adjudged a bankrupt upon the petition of a creditor, perhaps not unfriendly. The assignment was, in itself, only constructively fraudulent; and was, of course, in the absence of actual fraud, no objection to the bankrupt's obtaining a discharge from his debts. in the proper subsequent stage of the proceedings.

The revised statute of 1825 (6 Geo. IV. c. 16, §§ 6. 7) introduced the voluntary system of bankruptcy, by allowing a trader, with or

without concert with a creditor, or other person, to become a bankrupt by filing a declaration of insolvency at the bankrupt office. The enactment of this statute, as to fraudulent conveyances or transfers, has been quoted. The court of exchequer, in 1835, decided that a trader's assignment in 1832. of all his property, in trust for the benefit of his creditors, was an act of bankruptcy. though there was no evidence of the intent to delay them except the deed itself. Lord Wensleydale said. "When a man assigns all his property, and puts it into a different course of distribution from what the bankrupt laws direct, he commits an act of bankruptcy." Stewart v. Moody, 1 Cromp. M. & R. 777. The statute of 1825, § 4. provided that such a deed of trust for the benefit of all the creditors should not, if certain prescribed conditions were observed, be deemed an act of bankruptcy, unless a commission should issue within six months, and the statute of 1849, § 68, provided similarly unless a petition for adjudication should be filed within three months, from the execution of the deed. These were legislative recognitions that it was, in itself, an act of bankruptcy, under the previous and continuing description of a conveyance with intent to delay creditors. This was the state of the English law upon the subject when the present bankrupt law of 2d March, 1867, [14 Stat. 517, c. 176,] was enacted by congress. Its words were, in most parts of it, wisely taken from the English statutes of 1849 and 1861, and from the insolvent law of Massachusetts. These were the acts of legislation which had undergone the most careful revision, on the respective sides of the Atlantic. In applying the rule that the interpretation of a law forms part of it, the construction of a statute by the courts of the country whose legislature enacted it is adopted. The supreme court has, more than once, applied this rule of decision where an American statute had been taken from a prior English one; and has followed its English construction where the meaning might otherwise have been doubtful. The rule thus often furnishes a useful standard of uniform authority throughout the United States; and, where the construction was prior to the declaration of independence, an undeviating standard.

The 39th section of the present bankrupt law, in defining or describing acts of involuntary bankruptcy committed by conveyances, transfers, or assignments, first specifies those made by a debtor with intent to delay, defraud, or hinder his creditors. If the section had contained no further specification, the enactment would, under the English judicial precedents, have been understood as applicable to conveyances or transfers under all of the above three heads, including, under the last of them, the assignment in question. But the enactment goes further. It adds words, which, if not those of English decisions, are of equivalent import, expressly specifying cases under the second and third heads. These additional enactments are, by prefatory words, restrained in their application to debtors, bankrupt or insolvent, or acting in contemplation of bankruptcy or insolvency; and provide, that any such debtor making, within the previous period limited, any conveyance or transfer, either "with intent to give a preference," or "with the intent, by such disposition of his property, to defeat or delay the operation of this act," shall be adjudged a bankrupt. If the previous words, "with intent to delay creditors," are impliedly limited so as to include only dispositions of property which would be actually or constructively fraudulent under the Statute of 13 Eliz. c. 5, if no bankrupt law were in force—this is so only because those general words are here followed by the twofold express enactment which covers what they would otherwise have additionally included. As the intent of the assignment in question is legally inferred from its necessary tendency, the additional words "with intent to delay or defeat the operation of this act," include such a conveyance. They are words of like import with "puts his estate into a course of distribution different from that prescribed by the act," which had been the substance of the language of Lords Mansfield, Eldon and Wensleydale. But congress decided the question legislatively, not leaving it to judicial construction, as had been done in England. This appears to have been a very general opinion throughout the United States: 2 N. B. R. [Quarto,] 69, cols. 2, 3, dictum; 3 N. B. R. [Quarto,] 4, 5, 41, 61, 62, 98, 127; 4 N. B. R. [Quarto,] 124; [Grow v. Ballard, Case No. 5,848; In re Randall, Id. 11,551; In re Goldschmidt, Id. 5,520; In re Pierce, Id. 11,141; In re Smith, Id. 12,974; Spicer v. Ward, Id. 13,241; In re Stubbs, Id. 13,557.]

There is nothing whatever to the contrary in the decision that such a voluntary general assignment is not invalidated, through the mere existence of the bankrupt law, where no proceeding in bankruptcy has been instituted, either by or against the debtor: 33 Conn., [Hawkins' Appeal, 34 Conn. 548.] The same remark applies to cases in which the debtor had been adjudged a bankrupt, but the proceedings in bankruptcy were not commenced until more than six months after his execution of the voluntary assignment; and the bankruptcy was voluntary, or, if involuntary, was for some other act. In these cases the limitation of time in the 39th section prevented the question from arising at all. The decisions were that the voluntary assignment, unless it had been actually fraudulent, or constructively fraudulent under St. 13 Eliz. c. 5, independently of the bankrupt law, could not be set aside under any proceeding at the suit of the assignee in bankruptcy: 1 N. B. R. [Quarto,] 195, 204,

cols. 2, 3. [In re Arledge, Case No. 533; Sedgwick v. Place, Id. 12,622; Same v. Menck, Id. 12,616.] Nor is the question affected, in any wise, by the numerous cases in which bankrupts, who had made assignments within six months before the commencement of the proceedings, have nevertheless been discharged from their debts. A conveyance or transfer, not actually, but only constructively fraudulent, though an act of bankruptcy, is not a bar to a discharge. In England, an assignment like that in question, though an act of bankruptcy, has been considered morally unobjectionable, and sometimes an honorable act, as affording to any creditor an option to proceed in bankruptcy, or to all the creditors a right of obtaining a distribution without any bankruptcy: 1 Christ. Bankr. Law, (2d Ed.) 187–189.

These various cases have been stated, because, under a jurisdiction which is, in this country, novel to the present generation of lawyers, the questions have often been confounded with the one which is here properly to be considered. It should also be observed that, in the absence of actual fraud, the assignment in question, though constructively fraudulent under the bankrupt law, is not void, but voidable, and is voidable only at the suit of the assignee in bankruptcy. In a case like the present, if an injunction, with or without a receiver, is required in order to prevent the purposes of the bankrupt law from being frustrated, or impeded, the necessary interlocutory order may, of course, be made. The ordinary disability of a receiver to sell may create no embarrassment, because the trust of each opposing litigant is to sell and collect and distribute among the same beneficiaries in the same proportions. Sales may therefore be made by the assignee under the direction of the court, through a master, in a preliminary stage of the cause. The register having charge of the case in bankruptcy, may sometimes, perhaps, be appointed a special master in this court; and either the complainant, or the defendant, if a trustworthy person submitting himself to the jurisdiction, may be the receiver, or they may be joint receivers, with or without another. The estate cannot ordinarily be suffered to remain, even temporarily, under the control of the voluntary assignee, if the rights of distributees depend upon the litigation of questions peculiarly cognizable either in bankruptcy, or under the special auxiliary jurisdiction. Where no such conflict of right is apparent, a preliminary injunction, &c., will ordinarily be granted upon affidavit, after notice, unless the defendant will speed the proceedings in equity, by filing an early answer, so as to enable the complainant to set down the case for an early final hearing, on bill and answer, if he should be so advised. Until answer filed, it is, in this district, the practice to use any affidavits on file in the court of bankruptcy, without their being re-sworn. The defendant may answer immediately; and if, on answer filed, the complainant cannot safely dispense with testimony, the court will not, without great caution, interfere interlocutorily.

But, before answer, it is by no means, of course, to make, on motion, an order for a preliminary injunction. Cases have occurred in which the voluntary assignment protected equities which, without it, could not be protected under the bankrupt law itself. In one case, a judgment binding the debtor's land had, by due course of law, been obtained against him, between the execution of the voluntary assignment and the commencement of the proceedings in bankruptcy. In another case, the bankrupt's father, who was the largest creditor, had, with his own concurrence, been expressly excluded from the benefit of the voluntary assignment, which had created a trust for all the other creditors. In each case, the voluntary assignment had been an act of bankruptcy, but the assignee in bankruptcy, asking the aid of equity, was not, in either case, at liberty to disregard the palpable existing equities which could not be made available without the aid of the prior assignment. In such cases, if the defendant is not an untrustworthy person, whatever may be the proper decree at the final hearing, his trust may be usefully administered, in the meantime, in his own name. Of course it would not be administered without the permission and supervision of the court, or independently of supervision by the complainant, to whom, as the assignee in bankruptcy, the defendant must primarily or ultimately account. But the defendant's disposal of the estate, and collection of the assets, ought not, in such cases, to be embarrassed. Whether he should be permitted to make the distribution may be a different question. But, in every stage of proceedings, the pendency of the suit must, if the assignee in bankruptcy fulfils his duty, preclude any risk of sacrifice of property, or other loss by the creditors, or of delay. Lis pendens renders the sanction of the court necessary to enable the defendant even to dispose of the estate effectually. Where disposal by him is allowed, but distribution prohibited, he ordinarily receives, in this district, his reasonable charges, including an equitable proportion, usually one-half, of the commission which would otherwise be fairly chargeable.

Where no such specifically definable equity is thus protected by the previous assignment, its trusts may, nevertheless, have been so far executed, in good faith, and beneficially, that their further execution should not, in the primary stage of the cause, be impeded abruptly, if at all. In one case, this court suspended granting an injunction, and appointing a receiver, until the completion of a beneficial sale of real estate, which had been previously made by the defendant, who had already partly succeeded, and afterwards ·

completely succeeded, in removing defects of title. In Sedgwick v. Place, in the circuit court for the southern district of New York, before Judge Nelson, the debtors had failed in business, and made the general assignment, in November, 1867. They became bankrupts voluntarily in February, 1868. The previous assignees having, in execution of their trust, collected a large amount of money which was in deposit, awaiting distribution, the case being untainted with any actual fraud, a motion for a preliminary injunction was denied: [Case No. 12,622.]

Enough has been said to explain that this decision, which was one of those relied on by the defendant's counsel in the present case, does not apply to the particular question, whether such an assignment was an act of bankruptcy. This question has been since answered affirmatively by the respective district judges in the northern and southern districts of New York, who certainly intended no disregard of any opinion of Judge Nelson. The other cases relied on by the defendant's counsel were decided, in the circuit court for the southern district of Ohio, by Judge Swayne. To understand the first of them it is necessary to recur to the 50th section of the bankrupt act of 2d of March, 1867, providing that the act should commence and take effect, as to the appointment of the officers, and the promulgation of rules and general orders, from the date of its approval, but that no petition or other proceeding under the act should be filed, received, or commenced, before June 1st, 1867. A judgment was obtained by a creditor, in a proper court of Ohio, on June 1st, 1867, which, under a statute of that state, was a lien upon the debtor's land from 27th May, 1867, which was the first day of the term. On the 25th of May, 1867, the debtor executed a general assignment for the benefit of his creditors. The judgment creditor, without offering to waive his lien, filed, on 17th of July, 1867, a petition that the debtor should be adjudged a bankrupt, on the ground that, by the assignment, he had committed an act of bankruptcy. The avowed theory and purpose of the proceeding was that an assignee in bankruptcy might afterwards annul or set aside the assignment, and hold the estate, not discharged of this creditor's lien, but subject to it. Judge Swayne was of opinion that such an assignment, unless made with intent to delay, defraud or hinder creditors, within the meaning of St. 13 Eliz. c. 5, or with intent to defeat or delay the operation of the bankrupt law, was not an act of bankruptcy, and that, upon the proofs, it had not been made with either intent, and was not an act of bankruptcy: Langley v. Perry, [Case No. 8,067.] We would have been of the same opinion. The purposes of the bankrupt law would have been frustrated unavoidably, and its operation defeated, by the petitioning creditor's judgment, if the prior assignment had not been executed. On 25th May, 1867, this law was not in operation for the purposes of the question whether the assignment had, in the absence of actual fraud, been an act of bankruptcy.

In the other case the question was different in respect of the time of the act. The debtor's assignment was executed on 4th December, 1868; and the adversary proceeding of creditors to make him a bankrupt was commenced in the following month. He was adjudged a bankrupt; first, because he had not, in the meantime placed all his monies, credits and effects, unreservedly in the possession or control of the assignee, which omission made the assignment fraudulent under St. 13 Eliz.; and secondly, because the payment of certain creditors just before the assignment, had been preferences. Under the first head, the judge is reported to have said: "I do not mean to impute any intention to defraud, or do any wrong, to either party; but here are the facts, and the legal result is inevitable." But this result was, according to the report, arrived at only through the consideration that "all assignments by debtors" are "subject to the general rule contained in the statute of Elizabeth, exemplified in Twyne's Case, [3 Coke, 80; 1 Smith, Lead. Cas. 33,] and the many other subsequent decisions following it, all of which render void, as to creditors, all assignments at all tainted with fraud." The judge is, however, reported to have emphatically held, that such an assignment, as this purported to be, was "valid and proper when made in good faith," though it was "to be subjected to the sharpest scrutiny." He said that "any badge of fraud that attaches itself, in the light of extraneous circumstances, will unless fully explained, be fatal to its validity, and the arm of the bankrupt law will sweep it away, and subject the person and the estate to its own provisions:" Farrin v. Crawford, [Case No. 4,686.]

Neither of these cases, on the point which was decided in it, affects the present question. If, however, the dicta, as well as the decisions, are correctly reported, and the dicta are to be followed, such an assignment would not, without actual fraud, be considered an act of bankruptcy. If so, very complex litigations on the question of fraud, would frequently arise. This, in itself alone, would not be a sufficient objection to following the dicta. They have, however, for other reasons, been deliberately disregarded in subsequent cases, in district courts elsewhere. The reasons probably were, that if the only conveyances or transfers, not actually fraudulent, which constitute acts of bankruptcy, are cases constructively fraudulent under the statute of Elizabeth, and intentional preferences,—English decisions, beginning more than a century ago, will be disregarded, and there will be no apparent subject matter for the application of the words "with intent to

defeat or delay the operation of the act of congress."

In the United States, the reasons for considering such a general assignment an act of bankruptcy, are stronger than those which prevailed in England. During more than three-quarters of a century, since the constitution had enabled congress to establish uniform laws on the subject of bankruptcies throughout the United States, there had not been such a law in force except in two short intervals; and the usages and legislation as to voluntary assignments for the benefit of creditors, had, in the meantime, become various in the several states. The abrogation of such local differences, at the election of any non-assenting creditor, was an essential part of "an act to establish a uniform system of bankruptcy throughout the United States." In Pennsylvania there was, and, except as to a failing debtor who has been adjudged a bankrupt, still is, a peculiar legislative system, under which, as the supreme court has said, it is difficult to define the character of the procedure: [Shelby v. Bacon,] 10 How. [51 U. S.] 70. That court has said, that it "is not in the nature of a bankrupt or insolvent procedure:" Id. 71. Under the present bankrupt law of the United States, [Act March 2, 1867, 14 Stat. 517, c. 176,] there must, in the primary stage of the proceedings, be a carefully analyzed and explained schedule of debts. It afterwards undergoes revision by the assignee; and, independently of the required general notice by publication in newspapers, a special notice to every known creditor must be served, in a prescribed mode, in the primary stage, and in certain ulterior stages of the proceedings. The legislation of Pennsylvania requires no schedule whatever of debts; and does not prescribe any special notice even to creditors who are known. The omission of such a notice by the assignee, may, perhaps, on general principles, be considered a breach of trust; but, be this as it may, many estates have been finally distributed, and the assignees discharged, without any other notice than a publication in newspapers; and the adjudication of distribution of funds, or of discharge of the assignee, when made, is, in the local tribunals, considered conclusive. The trust may, at all events unquestionably be administered without any sworn, or other schedule of the assignor's debts by himself. Such an administration of such a trust, if independent of the jurisdiction in bankruptcy, would tend manifestly to defeat the operation of the act of congress. More manifest is the tendency of the Pennsylvania system to delay the operation of this act. The act requires a sworn inventory of the estate in the primary stage of the proceedings, and the normal course of distribution is a dividend in three months or earlier, and a final dividend in six months, or sooner; the funds to be, in the meantime, from the receipt of them by the assignee, deposited or invested under the control of the court of bankruptcy. Under the Pennsylvania system, the assignment need not be recorded, nor any inventory exhibited, nor security given, for thirty days, though the voluntary assignee may act unrestrictedly in the meantime. He is not compulsorily accountable for the extraordinary period of a year. The distribution of a deceased intestate's insolvent estate by the administrator, may, for necessary reasons, be thus delayed. But there is no proper analogy to the estate of an insolvent living debtor. It is observable that the auxiliary jurisdiction of the circuit and district courts of the United States, under the 2d section of the act of congress, cannot be exercisable unless there can be an adjudication of bankruptcy. If, as in Shelby v. Bacon, 10 How. [51 U. S.] 56, the jurisdiction of the circuit court in equity could be invoked by an alien, or a citizen of another state, this would be as objectionable as the general jurisdiction of the English chancery; indeed, much more so, because, except through the operation of the bankrupt law, the legislation of Pennsylvania could not be disregarded in a court of the United States. A Pennsylvania creditor could not sue there at all, and yet his rights in bankruptcy would be the same as those of such a complainant.

In Pennsylvania the assignment must, therefore, at all events, be deemed an act of bankruptcy. But it would have been one, in the opinion of the court, if there had not been any legislation of the state upon the subject. See the next case, [Burkholder v. Stump, Case No. 2,165.]